### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **Jane Doe (D.R,)** | |
| **Plaintiff** | |
| **v.** | **Civil Action No. 4:21-cv-02856** |
| **SALESFORCE.COM, INC. and BACKPAGE.COM, LLC,** | |
| **Defendants.** | |

### PLAINTIFF'S ORIGINAL COMPLAINT

Comes Now, Jane Doe (D.R.), Plaintiff in the above-styled and numbered cause, and files this Original Complaint complaining of Salesforce.com, Inc. and Backpage.com, Inc. as Defendants, and would respectfully shows the Court and Jury as follows:

### I.      OVERVIEW OF THE LAWSUIT

1.      Backpage was the largest sex trafficking website in the world until it was seized by the U.S. Department of Justice and shut down in 2018.  The key to Backpage's dominance of the sex trafficking market was its relationship with Salesforce.  Salesforce is a technology company that provides customizable software and personalized support to help its clients operate their businesses, manage their relationships with their customers, and market themselves to new customers.

2.       Beginning in 2013, Salesforce entered into the first of several lucrative contracts with Backpage.  Through providing technology and support to Backpage, Salesforce succeeded in greatly expanding Backpage's business to become the dominant force in online sex trafficking.  The relationship between Backpage and Salesforce endured for years, even while Backpage was under

criminal investigation and even after its CEO was arrested on sex crimes charges. Although Salesforce knew that Backpage was engaged in criminal trafficking and knew that its own actions facilitated trafficking on Backpage, Salesforce continued to do business with Backpage until it was shut down.

3.      The venture between Salesforce and Backpage left many trafficking victims in its wake. Plaintiff was one victim. Between early 2014 and mid 2017, Plaintiff was trafficked on Backpage and was repeatedly sold for illegal sex against her will. Plaintiff's trafficker paid money to Backpage to post explicit ads through which Plaintiff was sold. The trafficking of Plaintiff on Backpage occurred during the contractual relationship between Backpage and Salesforce and was facilitated by the tools and operational support that Salesforce provided to Backpage.

4.      Both Texas and federal statutes permit sex trafficking victims like Plaintiff to recover civilly against both sex traffickers and those who benefit financially from facilitating sex trafficking. Plaintiff files this lawsuit to hold Backpage and Salesforce accountable under these anti-trafficking laws.

## II.      JURISDICTION AND VENUE

5.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581, et seq. The Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as her federal claims.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

7.      Plaintiff was trafficked in this District and Division.

### III.    THE PARTIES

8.      Plaintiff is a natural person who is a resident and citizen of Texas. Plaintiff was at all relevant times a trafficked person as that term is understood under the TVPA and the Texas Civil Practice and Remedies Code Chapter 98.  Given the nature of these allegations, this complaint identifies Plaintiff as Jane Doe (D.R.) throughout. She may be contacted through her counsel.  There is a collective and compelling interest in keeping Plaintiff's identity anonymous.

9.      Defendant Salesforce.com, Inc.  ("Salesforce") is a foreign corporation organized under the laws of Delaware with its principal place of business in California.  Salesforce can be served with process by service on its registered agent in Texas, C T Corporation System, 1999 Bryan St. Ste. 900, Dallas TX 75201-3136. Salesforce does business in a systematic and continuous manner throughout this District and Division.  All references to Salesforce include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

10.      Defendant Backpage.com, LLC ("Backpage") is a Delaware Limited Liability Corporation registered to do business and doing business in Texas. Backpage may be served through its attorney of record, Mark Castillo, 901 Main Street, Suite 6515, Dallas, Texas 75202.  All references to Backpage include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Backpage now or at any time relevant to the claims herein.

### IV.    ASSUMED OR COMMON NAME

3

11.     Plaintiff brings this petition against each Defendant in its assumed or common name and expressly reserves the right under Federal Rule of Civil Procedure 17 to substitute the true name of any Defendant if needed or in response to a Court order.  Moreover, Plaintiff expressly invokes the right to amend under the doctrine of misnomer if any Defendants are properly served, but sued and served under the wrong legal name.

### V.     CONDITIONS PRECEDENT

12.     All conditions precedent to the filing of this lawsuit have been performed or have occurred.

### VI.     FACTUAL ALLEGATIONS

**A.  The Reach of Human Trafficking Has Greatly Expanded in Recent Years Through The Use of Technology And With The Support Of Modern Technology Companies.**

13.     Human trafficking is a public health crisis that has reached epidemic proportions. Sex trafficking comprises a significant portion of overall trafficking and the majority of transnational modern-day slavery.[1]  There are an estimated 4.8 million victims of sex trafficking worldwide, with the United States leading all other nations in driving demand.[2]  And it is estimated that there are more than 300,000 victims of human trafficking in the State of Texas, and nearly 80,000 of those are identified as minors.[3]  Human trafficking earns profits of roughly $150 billion per year, with two-thirds of these dollars resulting from sexual exploitation of the victims.[4]

14.     The number of human trafficking victims has grown exponentially in recent years.[5] Online exploitation of victims has transformed the commercial sex trade and, in the process, has

---

[1] *Trafficking in Persons Report 2008*, U.S. Department of State, https://2001-2009.state.gov/g/tip/rls/tiprpt/2008/index.htm.
[2] U.S. Institute Against Human Trafficking, https://usiaht.org/.
[3] Tex. H.R. Con. Res. 35, 86th Leg. R.S.
[4] *Human Trafficking by the Numbers*, Human Rights First (2017), https://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[5] Tex. H.R. Con. Res. 35, 86th Leg. R.S.

contributed to the explosion of domestic sex trafficking. Social networks and online-classified sites are being used by traffickers to market, recruit, sell, and exploit victims for criminal purposes.  The internet and other modern technologies give traffickers the unprecedented ability to exploit a greater number of victims and advertise their services across geographic boundaries.[6]  These technologies impact various aspects of trafficking, from grooming, recruitment, and control of victims to advertising, movement, and financial transactions.[7]

15.    Traffickers need the technology and support provided by these businesses to operate, and they have found many businesses that will assist them as long as they are paid.[8]  These businesses affirmatively facilitate, assist, and support sex trafficking ventures and have participated in the significant expansion of sex trafficking in recent years.

### B.  Backpage Was the Internet's Largest Sex Trafficking Hub.

16.    Backpage.com was established in 2004 and initially began as an online marketplace for various goods and services.  However, in 2008, the leading online marketplace, Craigslist, took steps that reduced sex ads on its platform.  For Backpage, this led to a period of "explosive growth" by "[o]ptimizing [its] geography strategy" and "capitalizing on displaced Craigslist ad volume."[9]

17.    During the late 2000s, it became apparent that classified ad platforms and social media sites were facilitating and profiting from commercial sex and trafficking.[10]

---

[6] Mark Latonero et al., *Human Trafficking Online: The Role of Social Networking Sites and Online Classifieds*, University of Southern California (2011), https://technologyandtrafficking.usc.edu/files/2011/09/ HumanTrafficking_FINAL.pdf.
[7] Mark Latonero et al., *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, University of Southern California (November 2012), https://technologyandtrafficking.usc.edu/files/2012/11/ HumanTrafficking2012_Nov12.pdf.
[8] *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking*, The Polaris Project (2020), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking.pdf.
[9] U.S. Senate Permanent Subcomm. on Investigations, *Backpage.com's Knowing Facilitation of Online Sex Trafficking*, https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf.
[10] Latonero, *supra* note 6.

18.     As early as 2008, Backpage had been publicly identified by law enforcement, United States Attorneys General, and every state Governor as the biggest and most notorious sex trafficking and pimping website in the United States.

19.     Backpage nonetheless worked to expand its role in online sex trafficking. Backpage's gross revenues increased from $5.3 million in 2008, to $11.7 million in 2009, and to $29 million in 2010.[11]

20.     By 2010, Backpage.com was the unchallenged leader in online advertising for human trafficking and exploitation of women and children.  The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[12]

21.     In September 2010, a group of 21 state attorneys general called on the then-owner of Backpage.com (Village Voice Media) to shut down its adult services section.[13]  Backpage.com refused and continued to profit from the exploitation of women and children, during which time it sought to portray the company as a defender of freedom of speech by challenging and seeking to discredit any person or entity that criticized the company and its business practices.

22.     For years, Backpage.com continued to profit from the exploitation of women and children.  Any reasonably prudent person who took even a cursory look at the Backpage.com website or did an internet search of the company would know immediately that Backpage was a purveyor of sex, not a general online marketplace.  In fact, Backpage.com was the largest and most notorious sponsor of commercial and coerced sex in the history of the internet.[14]  Backpage was the

---

[11] U.S. Senate Permanent Subcomm. on Investigations, *supra* note 9.
[12] Letter from the Nat'l Ass'n of Attorneys General to Samuel Fifer, Esq., Counsel for Backpage.com LLC (Aug. 31, 2011), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/2011/NAAG_Backpage_Signon_08-31-11_Final.pdf.
[13] *Id.*
[14] U.S. Senate Permanent Subcomm. on Investigations, *supra* note 9.

predominant force in online sex trafficking until it was shut down by federal law enforcement authorities on April 6, 2018.

23.     During 2013-2015, Backpage earned over 99% of its revenue from adult advertisements.[15]  Based on publicly available documents, Backpage earned approximately $71 million in revenue in 2012.   In the next 29 months, from January 2013 through May 2015, Backpage earned approximately $346 million in revenue, with nearly $340 million being from adult advertisements.

24.     The U.S. Senate Report provides the following summary of the true character of the Backpage.com business model:

> Internal Backpage documents make clear that this growth was attributable to "adult" advertisements. In a 2011 internal memorandum, for example, the company stated that it "possesse[d] the most popular adult online classified site on the Internet" and that it "use[d] the Adult categories to drive traffic to other categories [of classified ads]." According to internal documents, Backpage reported that although ads in the adult section represented only 15.5% of total ad volume in 2011, the company generated 93.4% of its average weekly paid ad revenue from adult ads.  Backpage's adult section dwarfed other categories on the site in the number of paid ads, with over 700,000 as of May 2011, compared to just over 3,000 for "Jobs" and 429 for "Automotive." Adult ads also received significantly more page views than the ads in other categories: As of May 2011, ads in the "Jobs" section had approximately 2 million page views and "Automotive" had approximately 580,000. By contrast, adult ads had over one billion page views, and no other single category had more than 16 million page views.[16]

25.     On April 5, 2018, Backpage's CEO Carl Ferrer entered into a plea agreement with the Department of Justice in which he admitted Backpage had operated as a site for the sale of illegal sex since 2004.[17]

---

[15]Declaration in Support of Arrest Warrant and Warrant, *State v. Ferrer* (Cal. Super. Ct), https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf.
[16] U.S. 24 Permanent Subcomm. on Investigations, *supra* note 9.
[17]  Plea  Agreement,  *United  States  v.  Ferrer*,  No.  2:18-cr-00464-DJH  (D.  Ariz.  Apr.  5,  2018), https://www.justice.gov/opa/press-release/file/1052531/download.

26.     On the same date, Backpage.com signed a plea agreement that contained the same admissions.[18]

27.     Backpage also admitted to its role in sex trafficking and related violations of law in a proceeding in Texas.  Backpage confessed that it did "knowingly receive a benefit from participating in a venture that involved the trafficking…of a child younger than 18 years of age, and by any means caused [the child] to engage in or become the victim of conduct prohibited by Section 43.05 Compelling Prostitution."[19]

28.     Backpage has thereby conceded it is a sex trafficker and criminal venture.  The nature of the venture was clear: venturing with individual traffickers and its corporate partners to engage in sex trafficking, exploitation of women and children, and related criminal behavior.

### C.  Salesforce Provides Customer Relationship Management Software and Support To Companies to Help Them Operate and Expand Their Businesses.

29.     Salesforce is the world's number one customer relationship management (CRM) platform. CRM is a technology for managing a company's relationships and interactions with customers and potential customers.  The goal is simple:  improve business relationships to grow one's business and profits.

30.     CRM systems help companies stay connected to customers, streamline processes, and improve profitability.

---

[18] Plea Agreement, *United States v. Backpage*, No. 2:18-cr-00465-DJH (D. Ariz. Apr. 5, 2018), https://www.justice.gov/opa/press-release/file/1052536/download.
[19] Judicial Confession and Stipulation and Certification of Discovery, *State v. Backpage.com*, No. 18FC-1653C (Tex. Dist. Ct. Apr. 9, 2018), https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=2709&context =historical.

31.     The CRM technology created and sold by Salesforce is called "software as a service" (SaaS).   Using Salesforce technology, a company has access to a coordinated set of applications tailored to its business model, including applications that:

- manage sales and customer support;

- manage all marketing functions, e.g., email, social media, ads;

- assist with customer service and support and problem solving;

- permit communications with employees, customers, et al.

- provide customer data integration and support;

- offer business intelligence analytics;

- help develop custom apps or programs; and

- process Internet of Things (IoT) data.

These Salesforce tools are designed and intended to enhance the efficiency and success of any business.

32.     The cornerstone of the Salesforce platform is the "customer org."  The "org" is the portal that serves as one continuing point of interaction between Salesforce and its customers.  It is an entity that consists of users, data, and automation corresponding to an individual customer.  The Salesforce "org" is confidential to the Salesforce customer and is not a platform accessible by public internet users.

33.     All of the software marketed by Salesforce is designed for specific customers and their unique needs.  Salesforce likewise provides personalized support to its customers to help them achieve their business goals.  The design, implementation, and support of Salesforce's service is a complex endeavor, personalized to every business.  The essence of the Salesforce business model

is both the technology offered and the affirmative support provided by Salesforce, both of which are designed to aid in the success of the customer's business operations.

### D. Salesforce Knowingly Participated in a Sex Trafficking Venture with Backpage and Financially Benefitted Through Its Participation.

*1. Salesforce participated in a sex trafficking venture with Backpage by facilitating sex trafficking on Backpage.*

34.     By 2013, Backpage found itself in need of a partner who could facilitate and support the company's exponential growth.

35.     Backpage did not have the ability to keep pace with increasing customer demand and scale its platform into an international sex-trafficking hub without operational support, marketing innovation, guidance and better "customer relationship management" tools and capabilities.

36.     Salesforce, and its powerful tools used to improve Backpage's business functions and growth, bridged this gap by providing targeted support and solutions essential for Backpage's operational needs.  Salesforce advertises itself as a company that can drive business growth through the use of customer relationship management, marketing consultation and implementation, financial processing implementation and support, bespoke analytics, and other applications and technology.  Each of these components are designed to aid in the success of the customer's venture.

37.     In 2013, Backpage signed the first of many contracts with Salesforce and paid Salesforce for its technology and support.  Thereafter, until Backpage was seized by federal law enforcement authorities in April 2018, Salesforce assisted, supported, and facilitated Backpage in its trafficking operations through providing its CRM software, associated support and facilitation of Backpage's development.

38.     Salesforce sold Backpage access to several products and features including, but not limited to, Salesforce's premier level product (the Enterprise Edition) and Pardot (an advanced marketing technology).

39.     Salesforce affirmatively and independently provided Backpage with the tools Backpage needed to operate and grow and the support Backpage needed to take advantage of those tools.  With a solid CRM strategy in place, a business—such as Backpage—can collect detailed, in-depth customer data and use the data to streamline communications and overall business practices. Salesforce's software and support therefore impacted all aspects of Backpage's business, including customer service, sales, and marketing.

40.     Salesforce affirmatively provided unique technological tools and instruments to Backpage as part of its internet-based online selling of sex, sex trafficking, and compelled prostitution, including the trafficking of Plaintiff.  And Salesforce provided personalized support for the technological tools and instruments that made it possible for Backpage to engage in the internet based on-line selling of sex, sex trafficking and compelled prostitution, including the trafficking of Plaintiff.

41.     Salesforce was the driving force that enabled Backpage to scale its operations and increase the trafficking conducted on Backpage.  By providing technology, implementation skills, and ongoing support that all constitute affirmative acts by Salesforce that encouraged the wrongdoing in which Backpage.com was engaged and facilitated the sex trafficking operation.

42.     The sophisticated CRM tools and support provided by Salesforce to Backpage directly resulted in unprecedented growth of the Backpage.com website, its sex trafficking venture, and profits for Backpage and its corporate partners (including Salesforce).  Salesforce's technology

11

and support helped grow Backpage from a small Dallas-based company with a handful of employees to an international powerhouse with over 250 employees spanning three continents.

43.    The goods and services sold by Salesforce and purchased by Backpage were for internal Backpage use only and were designed and intended to be for the exclusive use of Backpage employees in the pursuit of customers for the Backpage.com site.  Salesforce did not host a platform or otherwise provide access to the internet or another public forum for the expression of public views, the exchange of marketable items, or any other publicly accessible purpose.

44.    Further, Salesforce did not merely sell an off-the-shelf product that enabled Backpage to grow without the input of Salesforce.  Rather, Salesforce sold Backpage targeted solutions addressed to the needs of Backpage's business.

45.    Indeed, an in-house Salesforce executive recommended that Backpage's needs would be best served by Salesforce's Enterprise CRM edition. As described on its website, the Enterprise edition is "fully customizable," providing a "deeply customizable sales CRM for [Backpage]'s business" of prostitution and sex trafficking.[20]  In any event, an integral component of the Salesforce product suite is active, ongoing support that is necessarily tailored to the needs of the customer seeking support.

46.    Salesforce provided Backpage with personalized services tailored specifically to the needs of its illegal business.  For example, in 2015, Backpage was under intense public scrutiny surrounding credit card companies' refusal to process their transactions due to the nature of Backpage's business.  Backpage was in fear of imminent law enforcement seizure in the United States and therefore sought to establish and maintain a duplicate copy of the Backpage operations system and platform for use overseas.  Salesforce knowingly assisted, supported, and facilitated

---

[20] *Sales Cloud Pricing,* Salesforce, https://www.salesforce.com/editions-pricing/sales-cloud/.

this system reorganization and provided the technical infrastructure for Backpage to move and operate its business overseas.  In other words, Salesforce addressed a need unique to Backpage's business—the need for a duplicate of Backpage's system—and in doing so directly assisted Backpage in evading law enforcement scrutiny in the United States.  These type of tailored services were not "generic" or "off the shelf."

47.     Throughout the time Salesforce did business with Backpage, Salesforce retained ownership and control of the Salesforce platform and technology, including the Backpage "org" that was hosted by Salesforce.  As set forth in the binding Master Service Agreements applicable to the time period Backpage was a customer, Salesforce retained the right to delete or restrict access to the Backpage org if the actions or content of the user was found to be unlawful or tortious.  And Salesforce retained complete ownership of its technology and products as specifically set forth in the contracts with Backpage.

48.     Each time a new application was purchased, support requested, or a contract renewed, Backpage consulted with Salesforce to assess its operational needs. This occurred, at a minimum, on the following dates:  November 12, 2013; November 16, 2016; December 13, 2016; January 28, 2017; and April 27, 2017.

49.     At any one of those dates, Salesforce, as the owner with retained control over the Salesforce platform and Backpage "org" had the ability to literally pull the plug on Backpage's use of the Salesforce technology and expertise.  Salesforce instead continued to facilitate Backpage's trafficking operation.

50.     Between 2013 and 2018, there was a continuous business relationship between Salesforce and Backpage.  The parties established a pattern of conduct or tacit agreement by which they jointly facilitated the trafficking of victims through Backpage, including Plaintiff.

51.     Backpage.com would have been unable to achieve its status as the behemoth of human trafficking and child sexual exploitation without the support, facilitation, expertise, and maintenance of Salesforce.

> 2. *Salesforce knew or should have known that its sex trafficking venture with Backpage was engaged in violations of anti-trafficking laws.*

52.     When Salesforce consummated a business relationship with Backpage, Salesforce knew—or, at minimum, should have known—that Backpage was a serial violator of human rights, a criminal enterprise guilty of violating state and federal law, and a rampant facilitator of human trafficking and sexual exploitation of minors.

53.     Salesforce learned about Backpage's illegal trafficking operations through its direct contact with Backpage representatives.  During Salesforce's initial negotiations with Backpage on or about November 6, 2013, a Certified Salesforce Consulting Partner met with Backpage CEO Carl Ferrer and another high-level Backpage executive for introductions and to assess and evaluate Backpage's needs and goals. The Consulting Partner reported back to a Salesforce executive in an e-mail on November 7, 2013 that he "spent most of the time learning of [Backpage] as a business," noting the need for security and advanced integration.

54.     On or about November 12, 2013, an in-house Salesforce Account Executive confirmed ongoing conversations with the Backpage executives and was confident that the partnership would soon be consummated stating, "I think this is trending strongly in our favor."

55.     While Salesforce may claim that it was technically employed by a Backpage affiliate, Salesforce knew at all relevant times it was working directly with Backpage through direct communications with Backpage executives and exchanging correspondence with Backpage at its business address and email addresses (@backpage.com) and taking money directly from Backpage.

14

56. From inception, therefore, Salesforce had actual knowledge of the nature of Backpage.com and the company's ardent need to conceal its internal business operations from public scrutiny. Indeed, as noted above, Salesforce affirmatively assisted, supported, and facilitated Backpage in moving a duplicate copy of its system overseas for the purpose of evading law enforcement scrutiny. Further, because Salesforce's services and support are personalized to the needs of each business, Salesforce could not have provided effective assistance to Backpage without understanding the needs of its business. Therefore, Salesforce knew that its software and the support it provided to Backpage were directly advancing the sex trafficking of adults and minors through Backpage.

57. Moreover, it was public knowledge that Backpage was a trafficking website throughout the course of Salesforce's relationship with Backpage. Prior to and including 2014, Backpage.com was in the news regularly. The articles ran the gamut, but the common theme was that Backpage.com was the leading platform for the facilitation of sex trafficking and other forms of human degradation.[21]

58. Salesforce's hometown newspaper, the San Francisco Chronicle, published no less than 400 prominent news articles concerning Backpage.com during the time period 2009 to 2017.

59. Among other news stories published in the Chronicle during the time Salesforce was nurturing its relationship with Backpage.com were the following:

> Man charged with sexual assault of a child
> March 10, 2012 | Michelle Casady
> The girl told police Parton also advertised her as a prostitute on the website Backpage.com and kept the money she made.
>
> Protesters: Village Voice helps sell kids for sex

---

[21] *See, e.g.*, Deborah Feyerick & Sheila Steffen, *A Lurid Journey Through Backpage*, CNN (May 10, 2012), https://thecnnfreedomproject.blogs.cnn.com/2012/05/10/a-lurid-journey-through-backpage-com/; Nicholas Kristof, *How Pimps Use the Web to Sell Girls*, N.Y. Times (Jan. 25, 2012), https://www.nytimes.com/2012/01/26/opinion/how-pimps-use-the-web-to-sell-girls.html.

15

March 29, 2012 | Verena Dobnik
They want the weekly's parent company to shut down its Backpage.com adult classified section, which they say includes ads linked to child sex-trafficking.

McGinn urges Backpage.com to check ages on sex ads
May 7, 2012 | P-I Staff and News Services
Backpage.com critics say the site is used to advertise underage prostitutes who are often victims of sex trafficking.

Charge: Online pimp rented out, raped runaway girl
September 18, 2012 | Levi Pulkkinen
Anderson, 29, posted provocative photos of the girl on Backpage.com along with his cell phone number. ... A Google search of Anderson's cell phone number returned several prostitution advertisements on Backpage.

Man sentenced to 26 years for forcing teen to work as prostitute
September 25, 2012 | Audrie Palmer
He then listed the girl's "services" through the website Backpage.com.

Prosecutors: Seattle man started pimping girl at age 11
March 8, 2013 | Levi Pulkkinen
Austin pimped one 14-year-old girl and another 16-year-old on the streets of SeaTac and Seattle earlier this year, while also advertising the prostituted children on Backpage.com.

FBI raids rescue 105 kids forced into prostitution
July 30, 2013 | Pete Yost Associated Press
The agency said it had been monitoring Backpage.com and other websites as a prominent online marketplace for sex for sale.

Sex trafficking: A horror in "plain sight"
July 17, 2014
Many of their names and photos can be found on web sites such as Craigslist and Backpage or at "very special web sites that are hidden from the public," Valazco said.

60.     There were weekly reports of atrocities perpetrated against women and children that would not have occurred without the facilitation, enticement, solicitation, and patronization of sex trafficking by Backpage.com—with the active support of Salesforce.

61.     Further, during the course of the relationship between Backpage and Salesforce, Backpage was frequently under public investigation for criminal activity.  Salesforce's relationship

with Backpage endured several nationwide law enforcement efforts, multiple civil lawsuits against Backpage and a much-publicized Senate hearing.

62.     In fact, while Salesforce was doing business with Backpage, Backpage's CEO, Carl Ferrer, was arrested in Texas on October 6, 2016, for pimping underage children.[22] A month *after* Ferrer's arrest, on November 17, 2016, Salesforce nonetheless renewed its contract with Backpage, with Carl Ferrer signing the agreement.

63.     Salesforce did not end its relationship with Backpage until April 2018, when the Justice Department shut down the Backpage.com website and effectively made it impossible for Salesforce to continue doing business with Backpage.

64.     Salesforce thus maintained a relationship with Backpage under circumstances and during a time period in which it is undisputed that Backpage was a venture engaged in human trafficking.  Salesforce affirmatively, actively, and continuously aided, encouraged, and contributed to the success of the Backpage.com trafficking venture, knowing that its software and support facilitated trafficking on Backpage.

65.     Salesforce was in a position to learn, and in fact did learn, about the illegal business practices of Backpage once the venture formed and, armed with this knowledge, Salesforce nonetheless chose to financially benefit on an ongoing basis as a result of its participation in an illegal commercial sex trafficking venture with Backpage.  Thus, Salesforce had actual awareness, knowledge, and an appreciation of the conduct in which Backpage was involved—human trafficking, sexual exploitation of women, men, and children, and prostitution.

---

[22] *Attorney General Kamala D. Harris Announces Criminal Charges Against Senior Corporate Officers of Backpage.com for Profiting from Prostitution and Arrest of Carl Ferrer, CEO*, State of California Department of Justice (Oct. 6, 2016), https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior.

66.     In the alternative, Salesforce at minimum had constructive knowledge—it knew or should have known—that Backpage was engaged in illegal business practices including, but not limited to, human trafficking and promotion of commercial sex activities.  Given that the illegal nature of Backpage's business was public information that was repeatedly highlighted in popular news sources, Salesforce at least should have known of the nature of Backpage's business.  Indeed, any examination of Backpage's internet operations and business needs—or even a simple Google search—would have revealed Backpage was in the business of the online selling of sex through the trafficking of persons. It is inconceivable that Salesforce was oblivious to the type of business being operated by Backpage at any time after Salesforce began working with Backpage.  Hence, even if Backpage's illegal business practices were not previously known to Salesforce, Salesforce was in a position in which it learned about the illegal business practices of Backpage once the venture was formed.

67.     Additionally, Salesforce knew—and it was publicly reported on numerous occasions during the relevant time period—that Backpage was engaged not only in the illegal sale of commercial sex, but specifically in the illegal trafficking of persons.  In other words, Salesforce knew or should have known that many of the persons advertised for sale on Backpage were not placed there willingly, but instead engaged in commercial sex acts because traffickers had forced or otherwise coerced them into doing so.  Moreover, Salesforce knew or should have known that many of the persons being sold for commercial sex on Backpage were minors.  Nonetheless, Salesforce chose to do business with Backpage anyway and to knowingly benefit from participating in a venture it knew was engaged in criminal sex trafficking.

> 3.  *Salesforce knowingly benefitted from participating in a sex trafficking venture with Backpage.*

68.     Armed with knowledge of Backpage's trafficking operations, Salesforce affirmatively chose to create and maintain a relationship—and to knowingly benefit financially by doing business—with Backpage, the largest sex trafficking venture in human history.

69.     As noted above, beginning in 2013, Salesforce signed several contracts with Backpage through which it knowingly received payment in exchange for supporting and facilitating Backpage's sex trafficking business.

70.     Thus, while Backpage was amassing huge profits from trafficking victims on its website, those funds were being used to pay Salesforce for its technology and continued support.

71.     Salesforce's relationship with Backpage and profits from that relationship expanded over time, as Backpage repeatedly sought out additional applications and support to meet its operational needs.  Thus, with the use of Salesforce's tools and instruments, Backpage's business exponentially grew, which required the scope of work covered by the Salesforce contracts (and Salesforce's profits) to grow as well with the purchasing of additional licenses, data storage, and other Salesforce features.

72.     By promoting the selling of sex and sex trafficking, Backpage made its money directly from traffickers and the sellers of sex.  Backpage used that money to continue its purchases and subscriptions with Salesforce.  Accordingly, Salesforce knowingly benefitted from participating in a venture it knew—or should have known—was engaged in unlawful conduct in violation of federal and state sex trafficking statutes.

73.     Salesforce knew Backpage used its technology and support to promote and facilitate the selling of commercial sex and sex trafficking. Salesforce knew that the payments it received from Backpage stemmed directly from a sex trafficking venture and were dependent on

the continued successful operation of that sex trafficking venture.  And Salesforce knew that it would not have continued to receive payments if Backpage's trafficking operation was shut down or otherwise failed.  Indeed, Salesforce knew that it continued to receive payments only because its software and services had been successful in facilitating Backpage's trafficking operation and its evasion of law enforcement scrutiny. Thus, by accepting funds from Backpage, Salesforce knowingly economically benefitted from the trafficking of Plaintiff and the thousands of other trafficking victims Backpage exploited.

### E. Plaintiff Was Trafficked on Backpage.com with Salesforce's Support and Participation.

74.    Tragically, before Backpage was seized by the Department of Justice, Plaintiff was trafficked with Backpage.  Jane Doe (D.R.) is a young, single mother, who resides with her child in Houston, Texas. In early 2014, prior to her 18th birthday, she met her trafficker on a dating website and became enamored of him. Playing on this, he began to post her on Backpage while she was still a minor and sell her for unlawful sex acts. During the course of the trafficking and abuse, the trafficker fathered her child. Throughout Jane Doe's (D.R.)'s trafficking Salesforce was participating in the venture with Backpage to assist Backpage in expanding its trafficking business. Jane Doe (D.R.)'s trafficker used a combination of force, fraud, coercion, enticement, alcohol and drugs to cause her to engage in commercial sex, forcing her to turn over all proceeds to him. Jane Doe (D.R.) was trafficked continuously on Backpage by these means until mid 2017.

75.    The compelled prostitution and trafficking of Jane Doe (D.R.) was made possible by the technology tools, operational support, and platform provided by Salesforce.

76.    Jane Doe (D.R.)'s trafficker paid money to Backpage to post ads selling Jane Doe (D.R.) for sex.  Backpage in turn paid Salesforce for its CRM and support.  Many ads selling Jane Doe (D.R.) for sex were posted on Backpage in several cities including, without limitation,

Houston, Texas, Phoenix, Arizona, New Orleans, Louisiana and Las Vegas, Nevada. Specifically, Backpage ads were paid for and posted in Houston and in the greater Houston, including but not limited to Saturday, August 1, 2015 at 12:27 PM; Friday, August 28, 2015 at 3:54 PM; Sunday, August 30, 2015 at 1:29 AM; Wednesday, September 23, 2015 at 4:52 PM; Tuesday, October 6, 2015 at 11:41 PM; and Thursday, October 8, 2015 at 11:11 AM.

77.     Jane Doe (D.R.)'s mother attempted, initially without success, to rescue her daughter from trafficking and reported her situation to the police.  Finally, on August 23, 2017 Jane Doe (D.R.), who was being held by the trafficker against her will in a house in Houston, Texas, was allowed to go to an HEB on Westheimer to buy food for her child. She sought and was given help at HEB to escape and was able to return home to her family. She then began the fight, with the assistance of CPS, to retrieve her child from her trafficker and his family. The trafficker was ultimately arrested in 2019 and served time in Las Vegas for trafficking. Since his release from jail, he continues to harass and terrify Jane Doe (D.R.). She has suffered significant and continuing physical and emotional injuries as a result of the trafficking. She is struggling to take back her life and works with Houston organizations to try to help other girls currently trapped in trafficking.

78.     Plaintiff's trafficker paid money to Backpage to post ads selling Plaintiff for sex. Backpage paid the money that it earned from trafficking to Salesforce in exchange for the Salesforce technology and support necessary for Backpage to operate and expand its business.

79.     During the period that Plaintiff was trafficked by and through Backpage, Salesforce was the sole provider, customizer, owner, manager and operator of the platform and technology that allowed Backpage to traffic persons and promote prostitution of others including Plaintiff.

80.     The compelled prostitution and trafficking of Plaintiff was made possible by Backpage's platform and the technological tools, operational support, and continuous affirmative assistance, support and facilitation provided by Salesforce.

## VII.   CAUSES OF ACTION AGAINST SALESFORCE

### First Cause of Action—Sex Trafficking Under 18 U.S.C. § 1595

81.     Plaintiff incorporates the allegations in paragraphs 1-82.

82.     Salesforce violated the federal anti-trafficking statute—the Trafficking Victims Protect Act and its reauthorizing statutes—under 18 U.S.C. §§ 1591 and 1595.  Federal law found in 18 U.S.C. § 1591 provides:

> (a)Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

83.     The civil provision of the federal human trafficking scheme is found at 18 U.S.C. § 1595:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate

22

district court of the United States and may recover damages and reasonable attorney's fees.

84.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1595, as she was trafficked and sold for commercial sex against her will, initially while she was a minor.

85.     Salesforce knowingly benefitted, by receiving financial and other things of value across multiple contracts with Backpage, through its participation in a venture it knew or should have known involved the trafficking, recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, and/or soliciting of Plaintiff and otherwise furthered the sex trafficking of victims as more fully described elsewhere in this complaint.

86.     Salesforce knowingly received substantial financial benefits from facilitating trafficking through Backpage, including but not limited to, fees and revenues arising from its relationship with Backpage and Backpage-related entities.

87.     As more fully described elsewhere in this complaint, Salesforce knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPA, 18 U.S.C. § 1591 and § 1595.  Salesforce knew or should have known that many of the persons posted for sale on Backpage, including Plaintiff, were forced into sex trafficking and/or were minors.

88.     More specifically, Salesforce affirmatively and knowingly participated in, assisted, supported, and facilitated the Backpage sex trafficking venture on an ongoing basis by, at a minimum, the following:

   a. Providing, assisting, supporting, and facilitating a world-renowned Customer Relationship Management (CRM) system with support services that were then used by Backpage to operate at maximum efficiency and profitability.

   b. Providing, assisting, supporting, and facilitating the trafficking operations of Backpage.com using sophisticated software and related technologies.  Salesforce

provided support to Backpage in the use of these technologies and had knowledge of the manner in which Backpage operated with these enhanced capabilities.

c. Providing, assisting, supporting, and facilitating Backpage with capabilities and support for direct marketing campaigns, coupled with information gathering such as tracking clicks and tracking internet activity of the sex traffickers to help Backpage manage and track the effectiveness of Backpage's marketing efforts. Salesforce helped Backpage collect and monitor data about the sex traffickers that were using Backpage to ensure improved outreach to those traffickers and improved customer service. These steps were designed to aid in the success of Backpage.com's trafficking operations.

d. Providing, assisting, supporting, and facilitating more personalized outreach with automation using "dynamic content" and automated messaging to target traffickers and sex buyers.

e. Providing, assisting, supporting, and facilitating enhanced customer targeting using data from existing traffickers on Backpage and creating cross-selling and upselling opportunities.

f. Providing, assisting, supporting, and facilitating the collection of electronically stored information on user and platform interactions and social media interactions, including user preferences ("likes"), to advertise more effectively to traffickers and sex buyers.

g. Providing, assisting, supporting, and facilitating surveillance and analysis of customer and user activity with regard to access to ads by tracking "clicks" (mouse clicks), collection of contact information, evaluation of purchasing habits, and correlating outreach and marketing efforts with same.

h. Providing, assisting, supporting, and facilitating account planning including customer follow up, account reminders, modification of marketing and sales plans, and cross-function customer service capabilities to improve outreach and services to traffickers.

i. Providing, assisting, supporting, and facilitating a custom Application Programming Interface (API) for use by Backpage employees, which is a software intermediary that allows two applications to talk to each other. This capability was for use by Backpage and did not enable computer access by the public or non-Backpage personnel.

j. Providing, assisting, supporting, and facilitating cutting edge customer analytics to provide analysis of the behaviors of traffickers and sex buyers.

k. Providing, assisting, supporting, and facilitating the creation of a secure SMS (text messaging) platform and confidential messaging capabilities for exclusive use of Backpage customers and users to facilitate secure and private communications between sex traffickers and sex buyers.

l.  Providing, assisting, supporting, and facilitating the ongoing, active monitoring mechanism for Backpage's efforts to track its success, gain information from customers and traffickers, and further automate and develop Backpage's operations.

m.  Providing, assisting, supporting, and facilitating a secure, custom Payment Processing Interface (PPI) and/or Payment Gateway to connect payment technology and payment processing networks to facilitate transactions between traffickers and sex buyers.

n.  Providing, assisting, supporting, and facilitating the credit card processing system and account tracking capabilities provided by Salesforce to accept payments from traffickers.

o.  Providing, assisting, supporting, and facilitating efficiency enhanced with automation, such as cutting the time it takes to email and nurture leads, scoring leads using customer parameters set by the customer using artificial intelligence (AI), and handling customer questions using automation such as chatbots.

p.  Providing, assisting, supporting, and facilitating a secure storage database with redundancy and backup capabilities.

q.  Providing, assisting, supporting, and facilitating enhanced accessibility by use of technology permitting constant communications in support of customers and users.

r.  Providing, assisting, supporting, and facilitating Backpage's ability to expand its trafficking operation both domestically and abroad by offering technology and support that was essential to the growth of Backpage.com.

s.  Providing, assisting, supporting, and facilitating technology that created a breeding ground for sex traffickers to stalk and entrap survivors on Backpage.com.

t.  Providing, assisting, supporting, and facilitating Backpage in its capability to maintain control of access to the Backpage.com platform and/or users and customers and thereby to enhance Backpage's efforts to evade detection from law enforcement.

u.  Providing, assisting, supporting, and facilitating additional acts that constitute participation in a sex trafficking venture with Backpage.

89.     Each of the acts of Salesforce in providing, assisting, supporting, and facilitating Backpage were for internal Backpage use and operation only and were inaccessible to public internet users.

90.     Salesforce had both actual and constructive knowledge and notice of a venture involving human trafficking through Backpage.com by way of actions that enticed, harbored,

provided, obtained, advertised, maintained, patronized, or solicited victims of trafficking, including Plaintiff.

91.     Plaintiff further alleges, and the evidence will establish, that Backpage operated and participated in a venture that was actually engaged in human trafficking and that Salesforce facilitated that venture.

92.     Thus, Plaintiff alleges that Salesforce's own, independent conduct was a substantial factor in her trafficking, sexual abuse, and continuing damages.

93.     Plaintiff further alleges that, but for the contributions, technology, and overall support by Salesforce of Backpage, Backpage would not have achieved the general success it garnered, Backpage would not have escaped increased law enforcement scrutiny, Backpage would have foundered in the financial and payment markets, Backpage would have been unable to maintain its operational efficiency, and Plaintiff would not have been subjected to the criminal conduct at the hands of her traffickers and their accomplices.

94.     Hence, Salesforce knew that Backpage would achieve markedly greater success in its business operations with the use of Salesforce software and support and that Backpage relied on Salesforce to grow and function.  With the foreknowledge of the nature of the operations conducted by Backpage, Salesforce had actual knowledge—or at least constructive knowledge—that by providing technology and support to Backpage, it enabled Backpage to operate and markedly enhanced the success of Backpage's trafficking operation.

95.     Salesforce participated in a venture that trafficked Plaintiff and other persons as a result of a continuous business relationship between the traffickers and Backpage and Salesforce such that it would appear that the traffickers, Backpage.com, and Salesforce have established a pattern of trafficking conduct.

96.     Salesforce knowingly benefitted from participating in a venture it knew or should have known was engaged in illegal sex trafficking by engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

**_Second Cause of Action—Sex Trafficking Pursuant to Texas Civil Practice and Remedies Code § 98.002_**

97.     Plaintiff incorporates the allegations in paragraphs 1-82.

98.     Salesforce's acts and omissions outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002.

99.     Texas Civil Practice and Remedies Code § 98.002(a) provides that "[a] defendant who engaged in the trafficking of persons or who intentionally or knowingly benefits from participating in a venture that trafficks another person is liable to the person trafficked."

100.    As described in detail in ¶ 90 and elsewhere above, Salesforce participated in a sex trafficking venture with Backpage by providing technology and support that facilitated Backpage's operation, an operation Backpage has admitted was engaged in criminal human trafficking.

101.    Salesforce knew, from direct communications with Backpage, its work with Backpage, and from publicly available information, that Backpage was engaged in violations of anti-sex trafficking laws and that its venture with Backpage was supporting and facilitating such violations.

102.    Salesforce knowingly received a financial benefit directly from its support of Backpage and its participation in Backpage's sex trafficking venture in the form of repeated contractual payments that lasted several years.

103.     Salesforce's own, independent conduct was a substantial factor in Plaintiff's trafficking, sexual abuse, and continuing damages.

104.     But for the contributions, technology, and overall support by Salesforce of Backpage, Backpage would not have achieved the general success it garnered, and Plaintiff would not have been subjected to the criminal conduct at the hands of her traffickers and their accomplices.

105.     Hence, Plaintiff alleges that it was foreseeable that Backpage would achieve markedly greater success in its business operations with Salesforce's software and support.  With the foreknowledge of the nature of the operations conducted by Backpage, Salesforce had actual knowledge that its technology and support enabled Backpage to operate and markedly enhanced the success of Backpage's trafficking operation.

106.     Plaintiffs allege that Salesforce intentionally or knowingly benefitted from participating in a venture that traffics another person with Backpage in violation of Texas Civil Practice and Remedies Code § 98.002.

### VIII.   CAUSES OF ACTION AGAINST BACKPAGE

### *First Cause of Action—Sex Trafficking under 18 U.S.C. § 1595*

107.     Plaintiff incorporates the allegations in paragraphs 1-82.

108.     Backpage violated the Federal Human Trafficking Statute found at 18 U.S.C. § 1591 and 18 U.S.C. § 1595.  Plaintiff adopts and incorporates by reference the contentions underlying this theory of recovery as set forth above regarding Salesforce.

109.     Backpage repeatedly and for years violated sex trafficking laws by knowingly advertising minors and those forced into sex trafficking for sale on its website, including Plaintiff.

110.     Backpage knowingly benefitted, by receiving financial and other things of value, through its participation in a venture it knew or should have known involved the trafficking,

recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, and/or soliciting of Plaintiff and otherwise furthered the sex trafficking of victims as more fully described elsewhere in this complaint.

111.    Backpage received substantial financial benefits from the trafficking described in this complaint including, but not limited to, advertising and other ancillary fees from traffickers who utilized the Backpage.com website.

112.    Backpage knew that it was advertising minors and those forced into sex trafficking for commercial sex on its website.

113.    Backpage likewise knew or should have known it was participating in a venture involving the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits, in violation of the TVPA, 18 U.S.C. § 1591 and § 1595.

114.    Backpage had notice, both actual and constructive, as a result of the conduct outlined in this complaint.

115.    Backpage participated in a venture with, among others, Salesforce and Plaintiff's traffickers.  Each of the venturers shared a common purpose—advertising, soliciting, and trafficking women and children and the making of profits.  Backpage profited from the trafficking of Plaintiff.

116.    There was a continuous business relationship between Salesforce, the traffickers, and Backpage such that it would appear that the parties had established a pattern of trafficking conduct or could be said to have a tacit agreement.

117.    Backpage took affirmative actions in furtherance of the venture by continually supporting the trafficking of women and children, all the while ignoring the obvious signs of Plaintiff's trafficking, including her being publicly posted for sale on Backpage's website.

118.     Backpage's TVPA violations caused injuries and damages to Plaintiff.

119.     Plaintiff further alleges, and the evidence will establish, that Backpage participated in a venture that was actually engaged in human trafficking as more fully explained in this pleading.

120.     Backpage knowingly benefitted from participating in a venture it knew was engaged in illegal sex trafficking by engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

121.     Backpage knew that its repeated failures to address known risks of human trafficking would increase the overall volume of illegal commercial sexual exploitation and victimization at and the profits for Backpage, yet knowingly benefitted from facilitating the trafficking of persons on its website.

122.     In the alternative, Backpage had constructive knowledge and notice of a venture involving human trafficking that was operating on Backpage.com.

123.     Plaintiff thereby alleges, and the evidence will establish, that Backpage directly facilitated sex trafficking through the posting of advertisements for sex trafficking, in addition the following non-exclusive acts:

   a. Providing, assisting, supporting, and facilitating a forum for Plaintiff's trafficker to post her for trafficking.

   b. Failing to stop online posting of Plaintiff and other human or sex trafficking victims.

   c. Accepting advertising fees through www.backpage.com from human traffickers, including Plaintiff's trafficker, despite actual and/or constructive knowledge that those advertisements were for illegal activities, such as, but not limited to human trafficking, prostitution, and/or sexual exploitation of minors and other victims forced into commercial sex.

   d. Designing and implementing The Strip Term from Ad Filter to automatically sanitize advertisements intended to promote human trafficking, prostitution, and/or the sexual exploitation of victims in an effort to maximize advertising revenue, customer

satisfaction and avoid law enforcement detection of illegal acts to evade law enforcement attention.

e. Designing and implementing, in order to maximize revenue, a manual moderation system intended to sanitize posted content advertising human trafficking, prostitution, and/or the sexual exploitation of victims to give those ads the appearance of promoting legal escort services as opposed to illegal services.

f. Implementing a corporate policy to maximize revenue of sanitizing advertisements promoting human trafficking, prostitution, and/or sexual exploitation of victims instead of removing those advertisements from Backpage or reporting those advertisements to the proper law enforcement officers.

g. Knowingly implementing a corporate policy in order to maximize profit from the adult section of Backpage.com that discouraged moderators and employees of Backpage from contacting the authorities and/or advocacy groups when advertisements on Backpage.com clearly promoted human trafficking, prostitution, and/or sexual exploitation of victims.

h. Knowingly refusing to pull down advertisements (after Backpage had internally sanitized the ad either manually or with the use of the Strip Term from Ad Filter) that clearly demonstrated victims were being exploited and trafficked for sex.

i. Knowingly refusing to pull down advertisements after reports and/or complaints that the advertisement was being used to exploit a victim.

124.    Backpage knowingly benefitted from participating in a venture it knew or should have known was engaged in illegal sex trafficking by engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of Plaintiff for commercial sexual exploitation.

***Second Cause of Action—Sex Trafficking Under Texas Civil Practice & Remedies Code § 98.002***

125.    Plaintiff incorporates the allegations in paragraphs 1-82.

126.    Section 98.002(a) provides that "[a] defendant who engaged in the trafficking of persons or who intentionally or knowingly benefits from participating in a venture that trafficks another person is liable to the person trafficked."

127.     Therefore, Chapter 98 establishes both direct liability for those who engage in the trafficking of persons as well as beneficiary liability for those knowingly benefit from participation in a venture that trafficks another person.

128.     Backpage's acts, omissions, and commissions, taken separately and/or together constitute "trafficking of persons" as defined by Texas Civil Practice and Remedies Code § 98.001 because Backpage's conduct constitutes an offense[23] under Chapter 20A of the Texas Penal Code.

129.     More specifically, as described above, Backpage's conduct constitutes an offense under both Section 43.03 and 43.04 of the Texas Penal Code, which are both incorporated and listed in Chapter 20A.  Tex. Penal Code Ann. § 20A.02(a)

130.     For the reasons described in ¶ 125 and elsewhere above, Backpage's acts, omissions, and commissions, taken separately and/or together constitute violations of Texas Civil Practice and Remedies Code § 98.002, as Backpage engaged in and benefitted from the "trafficking of persons" as defined by § 98.001.

131.     At all relevant times, Backpage breached this duty by knowingly participating in the advertising and facilitation of trafficking victims, including Plaintiff.

132.     Backpage directly facilitated sex trafficking through the posting of advertisements for sex trafficking and other acts in violation of the Texas sex trafficking statutes as described in more detail throughout this petition and as enumerated as set forth in the section concerning violations of 18 U.S.C. § 1595.

133.     As described above, Backpage received substantial financial benefits as a direct result of these acts and/or omissions. These acts, omissions and/or commissions caused Plaintiff's

---

[23] Texas Civil Practice and Remedies Code § 98.002(b) provides that "it is not a defense to liability under this chapter that a defendant … has not been prosecuted or convicted under Chapter 20A."  Tex. Civ. Prac. & Rem. Code Ann. § 98.002(b).

injuries and damages. Therefore, Backpage is in violation of Texas Civil Practice and Remedies Code § 98.002.

## XIII.   JOINT AND SEVERAL LIABILITY

134.     "Joint and several liability 'applies when there has been a judgment against multiple defendants.'"[24]  If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount.[25]

135.     Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.[26]

136.     Similarly, in Texas, "where the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit. If fewer than the whole number of wrongdoers are joined as defendants to plaintiff's suit, those joined may by proper cross action under the governing rules bring in those omitted."[27] And the Texas Human Trafficking statute expressly imposes joint and several liability upon guilty parties.  Tex. Civ. Prac. & Rem. Code Ann. § 98.005.

---

[24] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).

[25] *See* Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

[26] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), *affirmed*, 612 F.3d 149 (2nd Cir. 2010).

[27] *Landers v. E. Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952).

137.    In conclusion, Plaintiff alleges Defendants should be held joint and severally liable to her for the totality of her injuries and damages.

## IX.   DAMAGES

138.    Salesforce and Backpage's acts and omissions, individually and collectively, caused Plaintiff to sustain legal damages.

139.    Plaintiff is entitled to be compensated for personal injuries and economic damages, *see, e.g.*, Tex. Civ. Prac. & Rem. Code. Ann. §§ 98.002, 98.003, 18 U.S.C. §§ 1593, 1595, including:

    a.    Actual damages.

    b.    Direct damages.

    c.    Incidental and consequential damages.

    d.    Mental anguish and emotional distress damages (until trial and in the future).

    e.    Restitution.

    f.    Unjust enrichment; and

    g.    Disgorgement of profits.

140.    Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

141.    A constructive trust should be imposed on Backpage and Salesforce and the Court should sequester any benefits or money wrongfully received by Backpage and Salesforce for the benefit of Plaintiff.

## X.   EXEMPLARY DAMAGES

142.    Plaintiff is entitled to exemplary, treble, and/or punitive damages under the applicable statutes against Defendants as a result of their outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 98.003; *Alfaro v. Gandy*, No. CV H-18-1761, 2019 WL 1789587, at *1 (S.D. Tex. Apr. 24, 2019).

34

## XI.   ATTORNEYS' FEES

143.     Plaintiff is entitled to recover its costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes.  *See* 18 U.S.C. § 1595(a); Tex. Civ. Prac. & Rem. Code Ann. § 98.003.

144.     All conditions precedent to Plaintiff's recovery of its costs and attorneys' fees have occurred, or will occur prior to entry of judgment in this suit.

## XII.   JURY DEMAND

145.     Plaintiff requests a jury trial in this action.

## XIII.   PRAYER

For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

a.   All economic damages to which she is entitled;

b.   All actual damages to which she is entitled;

c.   All incidental and consequential damages to which she is entitled;

d.   All mental anguish and emotional distress damages to which she is entitled;

e.   All restitution damages to which she is entitled;

f.   All disgorgement of profits to which she is entitled;

g.   All unjust enrichment damages to which she is entitled;

h.   Exemplary, treble, and/or punitive damages;

i.   Attorneys' fees and costs of suit;

j.   Pre-judgment and post-judgment interest at the highest rate allowed by law; and

k.   All other relief to which she is entitled in law or in equity.

Respectfully submitted,



By:   */s/ Kenneth T. Fibich*
        Kenneth T. Fibich
        Texas Bar No.: 06952600
        1150 Bissonnet Street
        Houston, Texas 77005
        tfibich@fibichlaw.com
        713-751-0025 (Telephone)
        713-751-0030 (Facsimile)

        Sara J. Fendia
        Texas Bar No. 06898800
        1150 Bissonnet St.
        Houston, Texas 77005
        sfendia@fibichlaw.com
        713-751-0025 (Telephone)
        713-751-0030 (Facsimile)

        Jay Henderson
        Texas Bar No. 09424050
        1150 Bissonnet Street
        Houston, Texas 77005
        jhenderson@fibichlaw.com
        713-751-0025 (Telephone)
        713-751-0030 (Facsimile)


        ATTORNEYS FOR PLAINTIFF